UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| ALBERTA REED, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:10-cv-00097-TWP-MJD |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | ) ) ) ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Alberta Reed ("Reed"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Reed's application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

## I. BACKGROUND

Reed was 54 years old on the date of her initial application for benefits. She has a ninth-grade education and has never obtained a GED. Reed's relevant past work includes positions as a mail sorter, hotel housekeeper, and assistant housekeeping supervisor. She alleges disability due to shortness of breath, chest pain, depression, anxiety, panic attacks, irritable bowel syndrome, fibromyalgia, back pain, and leg pain.

### A. PROCEDURAL HISTORY

Reed filed an application for DIB on June 19, 2006, alleging that she became disabled on March 9, 2006. Her application was denied initially and upon reconsideration. On February 11,

2009, Reed appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ") Priscilla M. Rae. On April 24, 2009, the ALJ issued her decision finding that Reed was not disabled. On December 11, 2009, the Appeals Council denied review of the ALJ's decision, at which point the ALJ's decision became the final decision of the Commissioner.

## B.  MEDICAL HISTORY

**1.  RFC Assessment**

On September 30, 2006, Reed underwent a physical residual functional capacity assessment by M. Ruiz, M.D. (R. at 595-602). Dr. Ruiz found Reed to be physically able to: "Occasionally lift and/or carry 50 pounds"; "Frequently lift and/or carry 25 pounds"; "Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday"; "Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday"; "Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry" (R. at 596); and "Frequently climb, balance, stoop, kneel, crouch, and crawl." (R. at 597). No manipulative, visual, or communicative limitations were established (R. at 598-99), but Dr. Ruiz noted that Reed should "avoid concentrated exposure [to] extreme cold, extreme heat, wetness, and humidity," and "avoid even moderate exposure [to] fumes, odors, dusts, gases, poor ventilation, etc." (R. at 599). Dr. Ruiz found Reed's allegations regarding the nature and severity of her symptoms and functional limitations to be partially credible. (R. at 600).

**2.  Shortness of Breath and Chest Pain**

On February 21, 2005, a physical examination was performed on Reed for chest pain. (R. at 253). Saeed R. Shaikh, M.D. reported chest pain suggestive of angina, borderline high hypertension, and dyslipidemia. (R. at 254). For Reed's angina with chest pain, Dr. Shaikh recommended cardiac catheterization, coronary angiography, and possible percutaneous

2

intervention. (R. at 254). The doctor also detected slurred speech and ordered a CAT scan of Reed to rule out any neurological issues. (R. at 254).

On April 16, 2005, testing performed on Reed by William C. Buffie, M.D. revealed atypical abdominal and chest pain with dyspnea, coronary disease, hypertension, questionable hematuria, and mild anemia. (R. at 242). Reed was hospitalized from April 16 through April 20, 2005 and underwent percutaneous intervention and cardiac catheterization. (R. at 244). Reed was found to have mid-LAD plaque proximal to her previous heart stent, and there was surprisingly mild-to-moderate instent restenosis in her TAXUS stent. (R. at 244). Dr. Shaikh had to add a stent within Reed's previous stent. (R. at 244).

On February 3, 2006, Reed underwent a treadmill test because of her complaints of chest pain. The test yielded no significant results. (R. at 188). David O. Kovacich, M.D. wrote Reed an 'off work' statement from March 9 through March 31, 2006 due to illness. (R. at 272). On March 13, 2006, Reed complained to Ganesh T. Ghooray, M.D. about shaking in her legs and arms. (R. at 426). Testing performed on March 15, 2006 by James J. Blahunka, M.D. revealed no active disease, but a benign calcified granuloma was found in Reed's right lower lung. (R. at 156).

On April 1, 2006, Richard L. Scales, M.D. concluded that Reed's lungs were free of active disease. (R. at 154). On April 11, 2006, a cardiac catheterization revealed minimal nonobstructive coronary artery disease and no obvious explanation for Reed's shortness of breath. (R. at 223). Additional testing performed by Michael D. Fisher, M.D. on April 21, 2006 also revealed no active chest disease. (R. at 147).

On April 24, 2006, Orrin W. Perkins, M.D. reported Reed's perfusion study as near normal and determined Reed to have a low probability for pulmonary embolism. (R. at 208).

Reed also underwent testing which demonstrated elevated airway resistance, decreased residual volume, and decreased corrected diffusion suggestive of small airways disease. (R. at 375).

On May 9, 2006, an echocardiogram report revealed only normal or trivial results. (R. at 206-07). A CT scan was performed for Reed's shortness of breath on June 12, 2006. (R. at 232). A June 22, 2006 chest x-ray and CT scan of Reed's sinuses were free of significant disease and Reed's pulmonary functions were reported as relatively normal. (R. at 284). On July 18, 2006, Reed was admitted to the chest pain unit for atypical chest pain. (R. at 260).

On November 29, 2006, Reed was examined by Dr. Kovacich for coronary artery disease and chronic chest pain. (R. at 631-32). Dr. Kovacich did not believe that Reed's symptoms were of cardiac origin. (R. at 632). On September 27, 2007, Reed was again admitted to the hospital for chest pain, which her doctor stated was probably from costochondritis. (R. at 742).

The results of a November 6, 2008 electrocardiogram performed on Reed were normal. (R. at 706). Perfusion images were also taken for Reed's chest pain and shortness of breath on November 7, 2008. These results were also normal. (R. at 703).

### 3. Leg and Back Pain

On May 17, 2005, Reed complained of foot discomfort, numbness, tingling, and soreness to Michael Dubois, M.D, who referred Reed to a podiatrist. (R. at 301). Reed underwent a deep venous ultrasound on May 25, 2005, which revealed no right lower extremity deep venous thrombosis. (R. at 216). Testing performed on Reed's lumbar spine on November 19, 2005 revealed some very minimal degenerative disc disease of the spine. (R. at 204).

On December 7, 2006, Reed was examined for pain in her joints and upper spine by Larry M. Greenbaum, M.D. (R. at 640). Dr. Greenbaum reported that Reed's musculoskeletal complaints were likely due to soft tissue tenderness. (R. at 641). Dr. Greenbaum noted a little

bit of osteoarthritis, but did not think it was Reed's main problem at that time. (R. at 640). Dr. Greenbaum did not prescribe Reed an anti-inflammatory drug, but gave her some exercises to try. (R. at 640).

On August 1, 2007, Reed was diagnosed with a right knee effusion and fibromyalgia, indicated by 15 out of 18 trigger points and one swollen knee. (R. at 889). An October 12, 2007 MRI of Reed's lumbar spine further revealed no significant central stenosis or clear direct nerve root impingement. (R. at 736).

On May 15, 2008, Reed's doctor noted reproducible tenderness in Reed's trapezius and upper spine and a decreased lateral rotation of her cervical spine. (R. at 794). Reed was given a lumbar epidural steroid injection for her chronic low back pain and right leg radiculopathy on October 24, 2008. (R. at 788).

**4. Irritable Bowel and Stomach Pain**

A gastric biopsy performed on March 24, 2006 demonstrated features of reactive gastropathy. (R. at 211). On March 30, 2006, Reed visited Todd Lemmel, M.D. complaining of epigastric pain and bloating. (R. at 238). An ultrasound and HIDA were normal and Reed's HIDA scan did not reproduce any pain. (R. at 238). On May 4, 2006, Heidi M. Dunniway, M.D. diagnosed Reed with reflux laryngitis with associated cough and dysphagia (R. at 413), and on May 11, 2006, Reed underwent a barium swallow test for dysphagia. (R. at 231). The results of a May 17, 2006 coronal sinus CT revealed trace mucosal thickening involving the inferior and inferolateral aspect of Reed's left maxillary sinus. However, no air-fluid levels were seen. (R. at 230).

On April 19, May 3, and July 11, 2006, Reed received a follow-up examination by Bruce H. Bender, M.D., who indicated that Reed's symptoms were most likely related to her anxiety.

(R. at 234, 236, 282). Reed also continued to visit Dr. Lemmel with varying intensities of constipation, irritable bowel, and bloating through 2008. (R. at 656-61, 668-73, 676-77).

**5. Depression, Anxiety, and Panic Attacks**

At an appointment on November 8, 2005, Reed stated that she is unable to sleep, even when taking Ambien. Further, she is unhappy for no particular reason, people get on her nerves, and she occasionally cries. (R. at 296).

On August 15, 2006, Reed underwent psychiatric evaluation for Social Security by Angela R. Marshall, PsyD, HSPP. (R. at 582-84). Dr. Marshall diagnosed Reed with a recurrent, major depressive disorder of moderate severity and a pain disorder associated with both psychological factors and a general medical condition, and assigned Reed a global assessment of functioning ("GAF") of 54. (R. at 584). Dr. Marshall concluded that it did not appear that psychological factors were adversely affecting Reed's ability to maintain gainful employment. (R. at 584).

On August 29, 2006, Reed underwent a physical consultative examination by Anas Safardi, M.D. for Social Security. (R. at 590-94). Dr. Safardi recommended that Reed be examined by a primary care physician for further evaluation for, among other things, her depression and anxiety. (R. at 594). On October 10, 2006, F. Kladder, Ph.D completed a Pyschiatric Review Technique form for Reed and listed Reed's mental impairment as "Not Severe." (R. at 603). Reed's only limitation was reported as mild difficulty in maintaining social function. (R. at 613). J.V. Corcoran affirmed Dr. Kladder's evaluation as written on December 29, 2006. (R. at 144).

On December 29, 2006, Reed complained to her doctor of memory loss, headaches, and confusion. (R. at 767). A brain MRI performed by Daniel E. Harris, M.D. revealed mild dural

6

thickening, stable enhancement within the left frontal convexity, and stable minimal white matter changes. (R. at 767-68). Dr. Harris described these findings as likely secondary to other conditions or of no significance. (R. at 767-68).

On November 19, 2007, Reed underwent a psychiatric evaluation by Dr. Pellow, who diagnosed Reed with major depression, panic disorder, and a GAF of 55. (R. at 693). Throughout 2008, Dr. Pellow noted little or no improvement in Reed's impairments. (R. at 692, 686, 684, 683).

### C. THE ADMINISTRATIVE HEARING

**1. Reed's Testimony**

At the hearing held on February 11, 2009, Reed testified that she had previously worked as a mail sorter and a hotel housekeeper. (R. at 25-26). Her mail sorter job involved sorting and shipping mail. (R. at 25). Specifically, Reed would label and bundle phone books and magazines to be sent to the post office. (R. at 25-26). These bundles weighed 75-80 lbs. (R. at 26). Reed's housekeeping work involved cleaning hotel rooms. Reed eventually became an assistant manager. (R. at 26). This added the additional duties of ordering supplies and, when the hotel was understaffed, doing laundry. (R. at 26).

Reed testified that she quit working due to shortness of breath, depression, anxiety, and panic attacks. (R. at 27). Reed missed a lot of work because she would have to lock herself in a room to be alone; she could not be around people, not even her husband. (R. at 27). Reed's depression symptoms include crying, panic attacks, and a fear of dying. (R. at 28). Reed recalls no triggering event for her depression, but has lost a lot of family members in the last few years. (R. at 30). Reed has seen counselors intermittently throughout her life. But until three weeks

ago, she had not seen one counselor consistently since her last counselor left her practice last year. (R. at 29).

Reed testified that her panic attacks happen once or twice a week, but sometimes more frequently. (R. at 27). To some degree, the attacks have been happening her entire life, but she used to be able to control them. (R. at 27). They have now gotten worse and medication does not help. (R. at 28). Reed has a panic attack almost every time she goes out of the house, which she does maybe once a week. (R. at 28). If Reed has a doctor's appointment, she leaves the house and has to come right back. (R. at 28). Reed also has a problem driving because people make her nervous; she frequently has someone drive her. (R. at 28).

Regarding her irritable bowel syndrome, Reed testified that if her bowels do not move then she is in constant pain. (R. at 30). Sometimes the pain is so bad that she doubles over. (R. at 30). Medication offers little help with Reed's constipation, and she is allergic to alternative medications. (R. at 30).

Reed also testified that her knees swell and hurt if she stands too long. (R. at 30). Sometimes they give out when she is walking, especially the right knee. (R. at 30-31). As recommended by her doctors, Reed does some exercise at home. (R. at 31). This includes walking at least two or three times a week, but Reed can only walk about one block before she is out of breath. (R. at 31). Reed also rides a bicycle a couple of times a month, depending on how she feels. (R. 31). Reed has tried to lose some weight, but has not lost any yet. (R. at 31). She gave up chocolate and cut back on eating and drinking sodas. (R. at 30-31).

Regarding her chest pain, Reed testified that it sometimes occurs while she is walking but that it also comes when she is not doing anything. (R. at 32). Reed has chest pain just about

every day, and she usually ends up in the emergency room. (R. at 32-33). If not, Reed has to stop what she is doing and wait for it to pass. (R. at 33).

Reed also testified to having back pain. (R. at 34). Reed testified that she cannot go back to her old job, presumably as a mail sorter, because it required lifting and her back would act up. (R. at 34). Reed's back pain also limits her ability to stand; she can only stand for about ten minutes before she has to sit down. (R. at 34).

## 2. **Vocational Expert's Testimony**

The vocational expert ("VE"), Robert Breslin, testified that Reed's past work as a mail sorter is comparable to the mail handler position described by the *Dictionary of Occupational Titles* ("DOT") 209.687-014. (R. at 35). This position is classified as light and semiskilled work with an SVP of four. (R. at 35). The VE clarified that Reed's description of her mail sorter position is "somewhat heavier," likely "medium to heavy," than as described by the DOT, which the VE stated was consistent with his observation. (R. at 35).

When questioned regarding a hypothetical individual of advanced age with a ninth grade education, who could do light work but needed a sit/stand option about every 30 minutes, the VE testified this individual would not be able to do any of Reed's past work. (R. at 35-36). This included Reed's past light work as a housekeeper and a housekeeper supervisor. (R. at 36). The VE did not think these jobs would allow her to sit/stand at 30-minute intervals and, therefore, concluded that the hypothetical individual would not be capable of doing any light work. (R. at 36).

The VE testified that Reed's past work as a non-supervisory housekeeper is comparable to DOT 323.687-014. (R. at 36). This position is classified as light and unskilled work. (R. at 36). Although there is no good comparison for Reed's supervisory housekeeper work, the VE

stated, according to Reed's description, the position is most likely light and at least semi-skilled. (R. at 36-37). The VE further testified all housekeeping jobs require you to be on your feet, moving from floor to floor. (R. at 37). The VE also testified that no skills from Reed's past work are transferable to sedentary work and there are no other jobs at the light level that would accommodate a sit/stand option. (R. at 37). The VE added that light jobs require the ability to stand at least six hours. (R. at 37).

## II. **DISABILITY AND STANDARD OF REVIEW**

To be eligible for Disability Insurance Benefits, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III. DISCUSSION

### A. THE ALJ'S FINDINGS

As reported in her decision, the ALJ found that Reed met the insured status requirements of the Social Security Act through December 31, 2010, and Reed had not engaged in substantial gainful activity since her alleged onset date of March 9, 2006. (R. at 13). The ALJ also found that Reed suffered from coronary artery disease, depression, reflux/gastro esophageal reflux disease, and fibromyalgia. (R. at 13). The ALJ further concluded these impairments were severe and would significantly limit Reed's ability to perform basic work activities. (R. at 13). Giving particular consideration to Listings 4.00, 6.00, 12.00, and POMS DI 24515-075 (R. at 13), the ALJ found Reed's impairments did not meet or medically equal any of those listed in the regulations' Listing of Impairments. (R. at 13). The ALJ further found Reed has the residual functional capacity to perform light, unskilled work. (R. at 15). In making the above determinations, the ALJ found Reed's subjective complaints regarding her symptoms to be exaggerated and accorded them less weight than the medical evidence of record. (R. at 17). Based on Reed's assessed RFC, the ALJ ultimately found Reed capable of performing her past relevant work as a mail sorter and a housekeeper. (R. at 18).

### B. REED'S ARGUMENTS ON APPEAL

Reed argues that substantial evidence fails to support the ALJ's step four determination that Reed is not disabled because she is capable of performing her previous work as a mail sorter and a housekeeper. At step four in the sequential evaluation process, an ALJ must determine whether a claimant has the capacity to perform her past relevant work based on the following findings of fact: (1) the claimant's RFC, (2) the physical and mental demands of the claimant's past work, and (3) whether the claimant's RFC would permit a return to her past work. SSR 82-

62p; *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). Reed claims error with all three of these elements, and each is addressed in turn below.

1. **RFC Determination**

First, Reed claims the ALJ ignored medical evidence in making her RFC determination. A claimant's RFC represents the most the claimant can still do despite her limitations, and it must be assessed based on all the relevant evidence in the claimant's case record. 20 C.F.R. § 404.1545(a); SSR 96-8p. "[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). However, it is firmly established that an ALJ need not address every piece of evidence presented. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). All that is required is that an "ALJ sufficiently articulate [her] assessment of the evidence" to assure a reviewing court "that the ALJ considered the important evidence and to enable [the court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

Reed asserts the ALJ failed to consider Reed's complaints of severe headaches, confusion, and memory loss. Contrary to this assertion, however, this evidence was indeed addressed in the ALJ's decision. The ALJ explicitly discussed Reed's complaints of chronic and tension headaches (R. at 17), as well as Dr. Marshall's findings that Reed exhibited no problems with memory or concentration and was able to follow simple instructions. (R. at 582-84). Although the ALJ did not specifically mention Reed's self-reported confusion and memory loss (*see* R. at 767), the ALJ accorded special weight to Dr. Marshall's examination in concluding that Reed had exaggerated her subjective complaints concerning the severity of her symptoms. (R. at 17).

Reed also asserts that the ALJ failed to consider the results of Reed's December 2006 brain MRI. As described by Reed, this test revealed "focal abnormal nonspecific dural thickening and enhancement along [Reed's] left frontal convexity…with white matter changes which were stable…." (Pl.'s Br. 15). Reed omits, however, the limiting modifiers, "mild," "minimal," "normal," and "benign," included by Dr. Harris in his review of the MRI findings. (R. at 767-68). Moreover, Dr. Harris concluded that these findings were "likely secondary" to other conditions or of "no significance." (R. at 767-68). Accordingly, the ALJ's failure to address the MRI specifically is harmless.

Reed further asserts the ALJ failed to consider Reed's complaints of, and treatment for, back pain. The Court finds this assertion to be cause for remand. In 2005, Reed was diagnosed with very minimal degenerative disc disease (R. at 204) and was given a lumbar epidural steroid injection for her chronic low back pain and right leg radiculopathy in 2008. (R. at 788). Reed also testified to several functional limitations caused by her back pain, including her ability to walk and lift. (R. at 34). In light of the fact that Reed's past work either involved standing six hours a day (R. at 35) or lifting 75-80 lbs (R. at 26), Reed's back pain required the ALJ's consideration. Perhaps the ALJ had plenty of cause to discount this evidence, but without even a mention, the Court is "left to wonder" whether Reed's back pain was considered at all. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). The ALJ should have addressed Reed's complaints of, and treatment for, back pain.

## 2. **Demands of Past Work**

Next, Reed claims the ALJ erred by making no findings as to the mental demands of Reed's past work. An ALJ is required to specifically set forth these findings so as to allow for meaningful review of the ALJ's step four determination. SSR 82-62p; *Getch v. Astrue*, 539 F.3d

473, 481(7th Cir. 2008). These can include the duties peculiar to an individual job as the claimant actually performed it, or as ordinarily required by employers throughout the national economy. 20 C.F.R § 404.1560(b)(2); SSR 82-61p. The regulations permit the *Dictionary of Occupational Titles* ("the DOT") to be relied upon for the latter. § 404.1560(b)(2); SSR 82-61p.

Citing *Strittmatter v. Schweiker* 729 F.2d 507 (7th Cir. 1984) and its progeny, Reed asserts that the ALJ failed to explicitly articulate the mental demands of Reed's past work as a mail sorter and a housekeeper. *Id*. at 509 (finding generic description of claimant's past work to be insufficient, without inquiring into any differences in duties between that job and other light work positions). Contrary to Reed's assertion, however, the ALJ appropriately relied on the mental demands of Reed's past work as performed in the national economy and described by the DOT. (R. at 18). The ALJ cites the VE's testimony that Reed's past work as a mail sorter is comparable to DOT 209.687-014 and 209.687-026,[1] and her housekeeper work, to DOT 323.687-014. (R. at 18; *see* R. at 35-36). According to the DOT, the mental demands of these jobs involve applying a "commonsense understanding to carry out instructions," with mail handler and mail clerk allowing for "several variables" DICOT 209.687-014, 209.687-026, and housekeeper, "occasional variables." DICOT 323.687-014.

Reed also asserts that the ALJ failed to verify whether the VE's testimony conflicts with the DOT. An ALJ has an affirmative duty to ask a vocational expert if the evidence the expert has provided about job limitations conflicts with the job descriptions listed in the DOT. SSR 00-4p; *Ketelboeter v. Astrue*, 550 F. 3d 620, 625 (7th Cir. 2008). However, when the DOT's descriptions of the jobs the VE discusses do not conflict with the hypothetical limitations given by an ALJ, the ALJ's failure to inquire is harmless. *Ketelboeter*, 550 F. 3d at 625.

---

[1] As discussed below, the record does not indicate that the VE ever made this comparison.

Here, the VE voluntarily identified an inconsistency between the DOT description of mail sorter job as "light" and the VE's description of the job as "medium to heavy." (R. at 35). Further, the DOT's light classification of mail sorter is consistent with the ALJ's hypothetical involving "light work," on which the VE's testimony was based. (R. at 35). Likewise, both the DOT and the VE classified the job of housekeeper as "light," in accordance with the ALJ's hypothetical. (R. at 36-37). To the extent that the ALJ was required to verify the DOT's consistency under these facts, her failure to do so is harmless.

### 3. Application of RFC

Finally, Reed claims that the ALJ erred in finding that Reed's RFC would permit her to return to her past employment. The assessed RFC must prevent claimant from doing her past relevant work; if claimant can still do this kind of work, the ALJ will find that she is not disabled. 20 C.F.R §§ 404.1520(e)-(f); SSR 82-62p.

Reed asserts the ALJ erred in concluding that Reed's RFC enabled her to perform her past work as a mail sorter. The ALJ determined Reed was capable of performing "unskilled work" (R. at 15), while the VE compared Reed's past work as a mail sorter to the "semi-skilled" description of mail handler under DOT 209.687-014. (R. at 35). Although Reed correctly asserts that this comparison is not a match, the ALJ explicitly concluded that Reed "cannot go back to the job of mail sorter" under this description. (R. at 18). The ALJ's ultimate determination was that Reed is capable of performing the duties of an "unskilled" mail clerk under DOT 209.687-026. (R. at 18).

What is problematic, however, is that the ALJ based the latter comparison on the VE's testimony "that there are many mail sorter jobs…in the light category." (R. at 18). The Court finds no such testimony in record, nor is there any discussion by the VE of DOT 209.687-026.

The only DOT description the VE set forth as comparable to Reed's past work as a mail sorter is the semi-skilled position described by DOT 209.687-014. (R. at 35). Having asserted no legitimate basis for concluding that the duties of Reed's past work are consistent with that of a mail clerk under DOT 209.687-026, the ALJ's application of Reed's RFC is erroneous and warrants remand.

Reed also asserts that the ALJ mischaracterized the VE's testimony in concluding Reed was capable of performing her past work as a housekeeper. An ALJ may not mischaracterize evidence of a disability that contradicts the ALJ's ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 916-17 (7th Cir. 2003). Here, the ALJ stated, "*The vocational expert testified that the claimant could also go back to her past relevant work as a housekeeper*" (R. at 18). However, the VE never gave such testimony. (R. at 35-38). In fact, the VE testified to the contrary, that a hypothetical individual that could do light work but needed a sit/stand option about every 30 minutes would not be able to do Reed's past relevant work or any other type of work. (R. at 36).

The Commissioner argues that the VE's actual testimony is consistent with the ALJ's RFC determination because the ALJ did not adopt the hypothetical sit/stand option in her final decision. (Df.'s Br. 6, n.1). However, the ALJ's mischaracterization of the VE's testimony, compounded with the ALJ's failure to consider Reed's back pain and walking limitations, creates an insurmountable barrier to accepting the Commissioner's logic.

## IV. CONCLUSION

For the reasons stated herein, the decision of the Commissioner of Social Security in this case is **REMANDED** for further proceedings consistent with this opinion.

IT IS SO ORDERED this day: 03/24/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

- **Charles D. Hankey**
  charleshankey@hankeylawoffice.com,kew@hankeylaw.com

- **Thomas E. Kieper**
  UNITED STATES ATTORNEY'S OFFICE
  tom.kieper@usdoj.gov,pearlie.wadlington@usdoj.gov,lin.montigney@usdoj.gov